Fuchsberg, J.
(concurring). I welcome the express recognition the court today gives to the concept that, under evolving child custody law in New York, circumstances other than the statutory and traditional ones of abandonment, surrender, permanent neglect and unfitness may form the basis for termination of a biological parent-child relationship, and I agree with the result it reaches. However, in concurring, the strength of my conviction that even greater movement in this area of the law is long overdue requires me to indicate the nature of some of my reservations.
Security, continuity and "long-term stability” (Matter of Ebert v Ebert, 38 NY2d 700, 704) in an on-going custodial relationship, whether maintained with a natural parent or a third party, are vital to the successful personality development of a child (see Foster, Adoption and Child Custody: Best Interests of the Child?, 22 Buffalo L Rev 1, 12-13, and authorities cited therein). Indeed, that is one of the soundest justifications for the priority which our society accords natural parents when the continuance of their status as parents is under legal attack.
The same considerations, however, it seems to me, dictate that, where a natural parent has affirmatively brought about or acquiesced in the creation of a secure, stable and continuing parent-child relationship with a third party who has become the psychological parent,[1] there comes a point where the "rebuttable presumption” which, absent such a change, is employed to favor the natural parent, disappears, as evidentiary presumptions usually do in the face of facts. Accordingly, when that point is reached, the determination of whether the original parental relationship has terminated should proceed without such bolstering of the natural parent’s position vis-ávis that of the child, the custodial parent or any other proper parties in interest. Generally speaking, when displaced by a state of facts contraindicating their further utility in a fact-finding setting, presumptions can only get in the way of substance, and, as a practical matter, when that happens, the *554 less they are relied upon the better. I would, therefore, that we had spelled out an evidentiary balance consistent with these principles for application in custody litigation, always bearing in mind that each custody case, dealing as it does with emotion-laden and highly sensitive human relationships, is unique.[2]
Further, I do not agree that inquiry into the best interests of a child must await a determination that, because of surrender, abandonment, neglect or "extraordinary” circumstances, a natural parent’s "rights” to a child are at an end. Willynilly, concern for the best interests of the child must play a central and unavoidable role in the resolution of such questions (cf. Matter of Gomez v Lozado, 40 NY2d 839 [decided herewith]).
Moreover, even under prior law, when only a finding of abandonment, surrender or neglect could defeat the presumption in favor of natural parents, the best interests of the child were involved from the very outset. Unfitness, for instance, cannot be determined abstractly or in isolation, but only relative to the psychological needs of a particular child, given its age, its mental health, its physical well-being and the like. And the very same conduct which constitutes clear neglect towards one child might not be so at all with regard to another child whose level of independence and emotional requirements are different. It follows that evidence offered to show that the State must intervene in a natural parent-child •relationship is, by its very nature, evidence as to the best interests of the child. In short, termination or intervention, on the one hand, and best interests, on the other, are not discrete matters. Pragmatically, they are closely interrelated. Proof of one overlaps the other and I do not believe they should be considered separately.
*555 I would add too that I am not completely convinced that there was not a sufficient basis for the decision of the Trial Judge, despite the unfortunate limitation on resources available to the Family Court and, often, the parties who appear before it (see Gordon, Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute, 46 St John’s L Rev 215, 256, n 204, and citations therein). Among other things, the trial court here fully heard out both Mrs. Jeffreys and Ms. Bennett, conducted an in camera interview with the child following which he concluded that she was a "happy, well-adjusted young girl” who "was most adamant about the fact that she wished to continue residing with Mrs. Jeffreys”, and, in aid of his determination, sought and had the benefit of a formal psychological study. Nevertheless, since painstaking fact finding is so far superior to presumptions and assumptions, and, therefore, should be encouraged, I join in the decision to remit this case for further information-gathering, noting, in doing so, that it is clear that it should not be controlling that Ms. Bennett, the natural mother, because she is now pursuing collegiate studies may at some time in the future be more likely to afford greater creature comforts for the child than is Mrs. Jeffreys, whose modest position on the vocational social scale did not prevent her from undertaking to act as surrogate mother and thus to form psychological bonds between the child and herself. And, needless to say, any profession by Mrs. Jeffreys that she would have been willing to return the child to her biological mother when she was older if it were in the best interests of the child for her to do so would be an evidence of altruistic maternal concern that would win the approval of every sound practitioner of child psychiatry from King Solomon on.
Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur with Chief Judge Breitel; Judge Fuchsberg concurs in result in a separate opinion.
Order reversed, etc.

. (Goldstein, Freud and Solnit, Beyond the Best Interests of the Child [1973]; Erikson, Growth and Crisis of the "Healthy Personality” in Personality, in Nature, Society and Culture [1955], 185-225; Bowley, Child Care and Growth of Love [1953]; Freud, Some Remarks on Infant Observation, 8 Psychoanalytic Study of the Child.)

. Commentators point out that presumptions and the burden to rebut them should be allocated “on the basis of pragmatic considerations of fairness, convenience, and policy” (James, Burdens of Proof, 47 Va L Rev 51, 60). Thus, where the burden of proof is allocated on policy grounds, it is most often done in order to "handicap” a party whose cause is disfavored (at p 61). That was the historical basis for casting the entire burden of rebutting the presumption in favor of natural parents on third parties in custody proceedings, the resulting substantive effect varying with the extent to which the "handicap”, combined with other evidentiary strictures, rendered the nonparent’s case difficult to maintain. In those jurisdictions where that policy was fully developed, it produced essentially the same results as were obtained under the old theory that children were the chattels of their parents (see Note, Alternatives to "Parental Right” in Child Custody Disputes Involving Third Parties, 73 Yale LJ 151, 154, n 18, and accompanying text).